1

2

3

4

5

6

7

8                        UNITED STATES DISTRICT COURT

9                      SOUTHERN DISTRICT OF CALIFORNIA

10   RONALD ARTHUR WEAVER,                    Civil No.    10-cv-655 LAB (POR)

11                              Petitioner,   **REPORT AND RECOMMENDATION**
                                              **DENYING PETITION FOR WRIT OF**
12            v.                              **HABEAS CORPUS**

13   KEN CLARK, Warden,                       **[ECF No. 1]**

14                              Respondent.

15                              **I. INTRODUCTION**

16        On March 25, 2010, Petitioner Ronald Arthur Weaver filed a Petition for Writ of Habeas

17   Corpus pursuant to 28 U.S.C. § 2254.  (ECF No. 1.)  Petitioner raises ten grounds for relief,

18   including seven allegations his trial counsel was ineffective,[1] two allegations his appellate counsel

19   was ineffective,[2] and one allegation the 2002 version of CALJIC No. 2.50.01 violated his

20   constitutional rights.  *Id.*

21   ///

22   _____

23        [1] In Grounds 1-7, Petitioner faults trial counsel for the following reasons: conducting an
     inadequate pretrial investigation (Ground 1, ECF No. 1 at 10-37); permitting perjured testimony
24   (Ground 2, ECF No. 1-1 at 1-7; failing to prevail on counsel's motion for an acquittal (Ground 3, ECF
     No. 1-1 at 8-22); permitting a poor instruction regarding pictures of child pornography found on
25   Petitioner's computer (Ground 4, ECF No. 1-1 at 23-27); bolstering the credibility of the prosecution's
     witness on cross-examination (Ground 5, ECF No. 1-1 at 28-32); failing to object to the prosecutor's
26   improper cross-examination of Petitioner (Ground 6, ECF No. 1-1 at 33-48); and failing to object to an
     "on or about" jury instruction (Ground 7, ECF No. 1-1 at 49-51);

27        [2] In Ground 8, Petitioner contends his appellate counsel was ineffective for abandoning two
     Fourth Amendment issues on direct appeal.  (ECF No. 1-1 at 52-54.)  In Ground 9, Petitioner contends
28   his appellate counsel was ineffective for failing to raise the various ineffective assistance of trial counsel
     claims.  *Id.* at 55-56.

1    On May 27, 2010, Respondent filed an Answer to the Petition.  (ECF No. 8.)  Respondent

2  first contends Petitioner's allegations his trial counsel was ineffective are procedurally defaulted.

3  (ECF No. 8-1 at 13-16.)  Second, Respondent contends the California Court of Appeal reasonably

4  and properly denied Petitioner's instruction claim on direct appeal.  *Id.* at 17-18.  Third, Respondent

5  contends Petitioner's trial counsel performed competently.  *Id.* at 18-22.  Fourth, Respondent

6  contends Petitioner's appellate counsel performed competently.  *Id.* at 23-24.

7    On August 2, 2010, Petitioner filed his Traverse.  (ECF No. 12.)  Petitioner contends there is

8  no procedural bar to federal review of any of his claims.  (ECF No. 12-1 at 2-9.)  Further, Petitioner

9  contends Respondent has failed to set forth sufficient facts or law to show cause why the relief

10  requested in the Petition should not be granted.  *Id.* at 10-19.

11    In consideration of the pleadings, the record, and controlling law, for the reasons set forth

12  below, the Court hereby RECOMMENDS the Petition be **DENIED**.

13                    **II. FACTUAL BACKGROUND**

14    This Court gives deference to state court findings of fact and presumes them to be correct;

15  Petitioner may rebut the presumption of correctness, but only by clear and convincing evidence.  28

16  U.S.C.A. § 2254(e)(1) (West 2006); *see also Park v. Raley*, 506 U.S. 20, 35-36 (1992) (holding

17  findings of historical fact, including inferences properly drawn from these facts, are entitled to

18  statutory presumption of correctness).  The following facts are taken from the California Court of

19  Appeal's opinion (Lodgment 30) affirming the judgment:

20    A.    *The People's Case*

21      1.    *The Alyssa Charges (Counts 1-3)*

22  Linda E. (Linda) lived with her children Keith and Kristyn, and her granddaughter Alyssa,
    who is Kristyn's daughter.  Alyssa was born November 1994, and was 10 years old at the
23  time of trial.

24  Weaver met Keith in the late 1990's.  Weaver and Keith developed a friendship, and Weaver
    began visiting Keith and the rest of his family at Linda's home almost every day.  Weaver
25  became one of Linda's best friends, and Linda invited him to Alyssa's birthday party in
    November 1999, when Alyssa turned five years of age.
26
    Weaver was nice to Kristyn, and spent a lot of time with Alyssa.  He taught Alyssa how to
27  use a computer and play computer games, and bought her toys and games.

28  Alyssa testified that when she and Weaver played computer games at her grandmother's
    (Linda's) house and she sat on his lap, he would place his fingers in her vagina, under he

- 2 -                                        10cv655-LAB (POR)

underwear.  She stated she did not remember his ever touching her "butt."  Later, however, she testified Weaver touched her bottom when she was sitting on his lap at the computer.  Weaver touched her more than one time while they were playing on the computer.

Alyssa stated that Weaver touched her vagina in Linda's swimming pool when Alyssa was sitting on his lap on the pool stairs.  She also testified that Weaver took off her underwear and touched her vagina with his tongue when she was lying on the bed in Linda's bedroom while Linda was in the living room, and this happened more than once.  Weaver touched her vagina with his tongue both in the pool and in her grandmother's bedroom.

Linda testified she once observed Weaver and Alyssa play a game called "Sleeping Beauty," during which Weaver bent down over Alyssa, who was lying on her back on a couch pretending to be asleep, and kissed her on her mouth to awaken her.  When Alyssa opened her eyes, Weaver told her they had to do it again, and he again kissed her on the mouth.  Weaver kissed Alyssa four times in a row.  Linda, who was sitting and reading nearby, was shocked by what she saw and stopped the game.

Linda observed Alyssa play computer games with Weaver, and she normally sat on his lap.  Linda did not always go with Weaver and Alyssa when they went swimming together.  Sometimes Weaver and Alyssa were alone together in Linda's bedroom when Linda was in another room.  One time, at the end of 1999 or the beginning of 2000 when Alyssa was sick and asleep in Linda's bed, Linda saw Weaver kneeling by the bed with his hands under the covers.  Linda asked him to leave the bedroom.  This incident bothered Linda, but not enough to make her call the police.

During the afternoon on July 14, 2000, Kristyn arrived at her mother's home to pick up Alyssa.  Kristyn went into the bedroom and saw Alyssa sitting on Weaver's lap in front of the computer. Kristyn testified that Alyssa's legs straddled Weaver, who had his hand on Alyssa's thigh, under her dress, about half way between her hip and knee. Kristyn was bothered by what she saw, and angrily told Alyssa to get down and not sit on Weaver's lap.  Kristyn also testified that Alyssa later told her, while pointing to her vagina, that Weaver had touched her under her skirt and underwear.  Kristyn took Alyssa home, and later returned to Linda's house, where she and Weaver were sitting in the den.  Kristyn confronted Weaver and called the police after he left.

Kristyn spoke to Detective James Nares when he arrived at the house later that same day.  On his recommendation, Kristyn took Alyssa to Children's Hospital the next day for an examination and an interview by an abuse specialist.  Alyssa's interview was videotaped and transcribed, the tape was played during the trial, and the transcript was provided to the jury.

2.      *The Natalie Charges (Counts 5-7)*

Natalie's parents, Russell T. And Deborah T., met Weaver in 1983 when Weaver and Deborah worked together.  Weaver became their friend and business associate, and he was a frequent visitor at their house before and after their children were born.

Natalie was born in November 1987.  Russell testified that she began wetting her bed in 1996, and she would pull away from him when he tried to tuck her into bed at night.  Even after Russell and his family moved to Virginia in November of 1998, when Natalie was 11 years of age, she still avoided him.

At trial, Natalie testified she was 17 years old.  Before her family moved to Virginia and they lived in San Diego, Weaver was a friend of the family, he visited her house often, and she called him Uncle Ron.  Weaver played video games with Natalie and her sister.

Natalie testified that Weaver touched her vagina under her underwear more than once when she lived in San Diego. The last time he touched her vagina was in 1998, when she was 11 years old and he was helping her family pack before they moved to Virginia. Natalie was sitting on a low dividing wall between the entry way and the living room, dusting the wall with a rag. Weaver, who was standing behind her, put his hand inside her pants and touched her vagina under her underwear.

Prior to that time, Weaver touched Natalie when she and her family lived in another house. Natalie was sitting in Weaver's lap on a chair at the kitchen table, as her sister was watching TV in the sitting room. As Weaver helped her make a ball out of rubber bands, he put his hand down her pants, and touched her vagina under her underwear with his fingers.

Another time, Natalie was sitting on Weaver's lap playing a computer game with him when he touched her vagina with his fingers under her underwear. Natalie would try to avoid Weaver by leaving the house and running to a friend's house when Weaver came over to visit. Sometimes she would hide in her room.

Natalie stated she did not tell her parents about what Weaver was doing to her because she was afraid of him. However, when she and her family were in Virginia, she told her mother, Deborah, about it because they were far away from him and she felt safer. Deborah testified that in March 1999, after she and her family moved to Virginia, she learned that Weaver had molested Natalie when Natalie told her he had touched her inappropriately. As a result of Natalie's disclosures, Deborah reported what Natalie told her Child Protective Services and Detective Rojelio Reyes in San Diego.

*3.      Investigation (Alyssa)*

In July 2000, Detective Nares contacted Alyssa's mother, Kristyn, and arranged for a medical examination of Alyssa at Children's Hospital. Deborah Davies, a forensic interviewer at the Chadwick Center at Children's Hospital, interviewed Alyssa later that month. During the videotaped interview, Alyssa told Davies that Weaver had put his fingers inside her vagina when she was sitting on his lap playing on the computer at her grandmother's house. Weaver told Alyssa to keep what he was doing to her secret because he did not want them to get caught.

Alyssa told Davies that Weaver touched her vagina "a lot of times," probably 100 or 150 times. She also told Davies that Weaver touched her inside her buttocks. The touching happened the most on the bed in her grandmother's bedroom.

Detective Reyes and Nares spoke with Weaver at his apartment in Ramona in early September 2000. After the interview, Detective Nares learned that Weaver had possibly molested another child, Natalie.

*4.      Investigation (Natalie)*

In late March 1999, Detective Reyes spoke by telephone with Natalie's mother, who was in Virginia. He was unable to set up an interview with Natalie.

The next day, Detective Reyes met with Weaver at the Ramona Sheriff's Station. Detective Reyes tape recorded the interview. Weaver said he had known Natalie since the time she was born, and he did not know why Natalie was saying he had touched her vagina. He wrestled with Natalie and her sister a lot, and it was possible he might have touched her vaginal area while they were wrestling, or while he grabbed Natalie by her shoulder and crotch to swing her in the air. Weaver said he did not remember touching Natalie under her clothing, and if his hand slipped under her clothing, it was unintentional.

Weaver also told Detective Reyes that he had held Natalie by her legs and at different angles when she was practicing gymnastics, and it was possible his hand could have been near her vaginal area. He also said Natalie's parents were always home when he was playing with Natalie and her sister.

In early September 2000, Detective Reyes and Nares spoke to Weaver at his apartment in Ramona regarding the allegations concerning Alyssa. When Detective Nares asked Weaver whether similar accusations of child molestation had been made against him, he said "yes," and mentioned Natalie. Detective Nares reviewed the case file regarding Natalie, and in late October 2000 flew to Virginia to speak with Natalie and her parents. Weaver was arrested in mid-November 2000.

### 5.  Search Warrant and Seizure of Computer Images

Patrick Diven testified that he met Weaver in college in the late 1980's and they became good friends. Diven visited Weaver at his home and used his computer. Once, between 1990 and 1992, Diven saw Weaver at his home and used his computer. Once, between 1990 and 1992, Diven saw on Weaver's computer sexually explicit photographs depicting young girls with adults. Although he found the pictures disturbing, Diven did not say anything about them to Weaver or report what he saw to the police at the time.

Diven was supportive of Weaver even when he was charged with child molestation.  Diven wrote a letter to Weaver's attorney stating he had never observed Weaver acting inappropriately around chidren.

In the spring of 2001, Diven again used Weaver's computer, while Weaver was in the bathroom, and saw a picture of a young girl, six or seven years of age, holding a flower. The next picture could have been of the same girl with adults, which he described as "very bad." He saw pictures of naked children.

Diven closed the pictures, printed some tax forms, and left Weaver's home. A few days later, Diven called someone he knew at the Sheriff's office in Ramona, and then called Dana Gassaway, an investigator at the District Attorney's office. Although he initially wanted to remain anonymous, Diven revealed his name after he spoke with Gassaway.

In April 2001, Detective Nares, Joe Green and Michelle Bustamonte, and Investigator Gassaway, executed a search warrant at Weaver's apartment in Ramona. They seized two computers, one from the living room and one from a small office, and turned them over to the Regional Computer Forensic Laboratory. They also seized a zip drive, keyboard, joy stick, mouse, printer, and some floppy disks.

Later that month, Detective Nares asked the Federal Bureau of Investigations (FBI) to look at the contents of the two seized computers. Special agent Jason Weiss, a forensic computer specialist, found in Weaver's computers approximately 1,850 image files of young children in sexually explicit acts or poses.

### B.  The Defense

Weaver, who was 45 years of age at the time of trial, testified in his own defense. He denied owning a computer that contained pornographic images between 1990 and 1992. He denied ever touching Alyssa's vagina or buttocks with his fingers while they were sitting at the computer, and he denied touching her vagina in her grandmother's bedroom or any other place. He also denied touching Alyssa's vagina with his tongue.

Weaver also denied touching Natalie's vagina while sitting in a kitchen chair while they were at a computer or in the den.

1
2
3
4
5
6
7
8

Weaver testified that in August 2001, he had testified at another hearing that the images found on his computer were there for research purposes regarding the characteristics of pedophiles and their victims, legal strategies, and issues of suggestibility. He explained that he had misunderstood the question to which he responded at that 2001 hearing. At trial, Weaver stated the images had nothing to do with research or legal strategies, or characteristics of pedophiles. He was looking at the pictures because he was trying to find "relevant information," but he found they did not provide such information. He did not learn much from the photographs, but learned a lot from the web sites concerning the characteristics of pedophiles. He found no redeeming or qualitative value to any of the photographs he looked at. When asked why he kept images on his computer hard drive if they had no qualitative or educational value and he could learn nothing from them, Weaver replied he deleted "large amounts" of images, but he simply did not delete all of them after he had saved them. He did not view any of the images for purposes of sexual gratification, and he found them "pretty disgusting." He denied that Diven ever came to his home between 1990 and 1992, and he testified he did not own a computer during that time period.

9      (Lodgment 30 at 3-11.)

10                                    **III. PROCEDURAL BACKGROUND**

11         In 2001, Petitioner was charged with multiple counts of committing a lewd and lascivious act

12     upon two separate girls, which made him eligible for multiple one-strike sentences under Cal. Penal

13     Code §§ 288(a) and 667.61(b)-(e). (Lodgment 1; Lodgment 2 at 2-4.) In August 2001, Petitioner

14     pleaded guilty to four counts of molestation as to one of the girls and six counts of attempted

15     molestation as to the other, and he waived his right to appeal. (Lodgment 2 at 3.) The prosecutor

16     withdrew the multiple-victim allegation, and Petitioner received an eighteen year prison sentence.

17     Petitioner asked to withdraw his plea, but the Court denied his motion and denied him a certificate

18     permitting an appeal of his withdrawal motion. (Lodgment 2 at 3-4; *see* Lodgment 18 at 6 n.2.)

19         In June 2002, Petitioner's appointed appellate counsel found no arguable issues and filed a

20     no-merit brief. (Lodgment 2.) Petitioner moved to replace his counsel, filed his own brief, and

21     sought writ relief regarding the denial of the certificate. (Lodgments 8, 10, and 12.) The California

22     Court of Appeal appointed Petitioner a new lawyer and granted him mandate relief, which permitted

23     Petitioner to raise an issue regarding his withdrawal motion in his appeal. (Lodgments 15, 16, and

24     18 at 6 n.2.) After additional appellate briefing, (Lodgments 19-21), the California Court of Appeal

25     reversed Petitioner's plea-bargained convictions and remanded for further proceedings. (Lodgments

26     22, 23.)

27         After a trial, a San Diego County jury acquitted Petitioner of one count of committing a lewd

28     act against one victim, but convicted him of six counts of committing a lewd act (three counts

1   against each girl), and further found Petitioner had committed his crimes against multiple victims.

2   (Lodgment 24 at 299-305.)  The court sentenced Petitioner to five consecutive terms of fifteen years

3   to life, for a total of seventy-five years to life in state prison.  (Lodgment 24 at 466-67.)

4          Petitioner appealed his conviction, (Lodgment 27), which the Court of Appeal denied.

5   (Lodgment 30.)  In July 2007, the California Supreme Court denied Petitioner's petition for review,

6   in which Petitioner exhausted the claim now raised as Ground 10.  (Lodgment 31 at 33-34;

7   Lodgment 32.)  On January 7, 2008, the United States Supreme Court denied Petitioner's certiorari

8   petition.  *Weaver v. California*, 552 U.S. 1107 (2008).

9          Subsequently, Petitioner sought state habeas corpus relief in San Diego Superior Court, the

10  California Court of Appeal, and the California Supreme Court on various allegations his trial and

11  appellate attorneys provided ineffective assistance of counsel.  (Lodgments 34, 36, 38.)  The San

12  Diego Superior Court and the California Court of Appeal found Petitioner's allegations of

13  ineffective assistance of trial counsel were procedurally defaulted, and rejected Petitioner's claims

14  regarding appellate counsel on the merits.  (Lodgments 35, 37.)  On May 12, 2010, the California

15  Supreme Court silently denied the petition.  (Lodgment 39.)

16         On March 25, 2010, Petitioner Ronald Arthur Weaver filed a federal Petition for Writ of

17  Habeas Corpus.  (ECF No. 1.)  On May 27, 2010, Respondent filed an Answer to the Petition.  (ECF

18  No. 8.)  On August 2, 2010, Petitioner filed his Traverse.  (ECF No. 12.)

19                                    **IV. DISCUSSION**

20         **A.     Standard of Review**

21         This Petition is governed by the provisions of the Antiterrorism and Effective Death Penalty

22  Act of 1996 ("AEDPA").  *See Lindh v. Murphy*, 521 U.S. 320 (1997).  Under AEDPA, a habeas

23  petition will not be granted with respect to any claim adjudicated on the merits by the state court

24  unless that adjudication: (1) resulted in a decision that was contrary to, or involved an unreasonable

25  application of clearly established federal law; or (2) resulted in a decision that was based on an

26  unreasonable determination of the facts in light of the evidence presented at the state court

27  proceeding.  28 U.S.C. § 2254(d); *Early v. Packer*, 537 U.S. 3, 8 (2002).  In deciding a state

28  prisoner's habeas petition, a federal court is not called upon to decide whether it agrees with the

1   state court's determination; rather, the court applies an extraordinarily deferential review, inquiring

2   only whether the state court's decision was objectively unreasonable.  *Yarborough v. Gentry*, 540

3   U.S. 1, 4 (2003); *Medina v. Hornung*, 386 F.3d 872, 877 (9th Cir. 2004).  Additionally, the state

4   court's factual determinations are presumed correct, and Petitioner carries the burden of rebutting

5   this presumption with "clear and convincing evidence."  28 U.S.C.A. § 2254(e)(1) (West 2006).

6         A federal habeas court may grant relief under the "contrary to" clause if the state court

7   applied a rule different from the governing law set forth in Supreme Court cases, or if it decided a

8   case differently than the Supreme Court on a set of materially indistinguishable facts.  *Bell v. Cone*,

9   535 U.S. 685, 694 (2002).  The court may grant relief under the "unreasonable application" clause if

10  the state court correctly identified the governing legal principle from Supreme Court decisions but

11  unreasonably applied those decisions to the facts of a particular case.  *Id.*  Additionally, the

12  "unreasonable application" clause requires that the state court decision be more than incorrect or

13  erroneous; to warrant habeas relief, the state court's application of clearly established federal law

14  must be "objectively unreasonable."  *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003).

15        Where there is no reasoned decision from the state's highest court, the Court "looks through"

16  to the underlying appellate court decision.  *Ylst v. Nunnemaker*, 501 U.S. 797, 801-06 (1991).  If the

17  dispositive state court order does not "furnish a basis for its reasoning," federal habeas courts must

18  conduct an independent review of the record to determine whether the state court's decision is

19  contrary to, or an unreasonable application of, clearly established Supreme Court law.  *See Delgado*

20  *v. Lewis*, 223 F.3d 976, 982 (9th Cir. 2000) (overruled on other grounds by *Andrade*, 538 U.S. at 75-

21  76); *accord Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003).  However, a state court need not

22  cite Supreme Court precedent when resolving a habeas corpus claim.  *Early*, 537 U.S. at 8.  "[S]o

23  long as neither the reasoning nor the result of the state-court decision contradicts [Supreme Court

24  precedent,]" *Id.*, the state court decision will not be "contrary to" clearly established federal law.  *Id.*

25  Clearly established federal law, for purposes of § 2254(d), means "the governing principle or

26  principles set forth by the Supreme Court at the time the state court renders its decision."  *Andrade*,

27  538 U.S. at 72.

28  ///

1    Where a petitioner alleges a state court decision is based upon an unreasonable determination

2 of the facts in light of the evidence presented in state court, he or she must demonstrate that the

3 factual findings upon which the state court's adjudication rests is objectively unreasonable. *Miller-*

4 *El v. Cockrell*, 537 U.S. 322, 340 (2003).

5    **B.    Analysis**

6    Petitioner raises ten grounds in his Petition.  In Grounds 1-7, Petitioner raises ineffective

7 assistance of trial counsel claims.  (ECF No. 1 at 10-39, ECF No. 1-1 at 1-51.)  In Ground 8,

8 Petitioner contends his appellate counsel was ineffective for abandoning two Fourth Amendment

9 issues on direct appeal.  (ECF No. 1-1 at 52-54.)  In Ground 9, Petitioner contends his appellate

10 counsel was ineffective for failing to raise the various aforementioned ineffective assistance of trial

11 counsel claims.  *Id.* at 55-56.  In Ground 10, Petitioner alleges the 2002 version of CALJIC No.

12 2.50.01 violated his constitutional rights.  *Id.* at 57-61.

13    As to Grounds 1-7, Respondent contends Petitioner's allegations his trial counsel was

14 ineffective are procedurally defaulted.  (Doc. 8-1 at 7-11.)  Further, Respondent contends

15 Petitioner's trial counsel performed competently.  *Id.* at 18-22.  As to Grounds 8 and 9, Respondent

16 contends Petitioner's appellate counsel performed competently.  *Id* at 23-24.  As to Ground 10,

17 Respondent contends the California Court of Appeal reasonably and properly denied Petitioner's

18 instruction claim.  *Id.* at 17-18.

19    For the sake of clarity, the Court will address Petitioner's claims in the following order: (1)

20 ineffective assistance of *appellate* counsel; (2) ineffective assistance of *trial* counsel; and (3) jury

21 instruction error.

22    **1.    Ineffective Assistance of Appellate Counsel Claims**

23    In Ground 8, Petitioner contends his appellate counsel was ineffective for abandoning two

24 Fourth Amendment issues on direct appeal.  (ECF No. 1-1 at 52-54.)  In Ground 9, Petitioner

25 contends his appellate counsel was ineffective for failing to raise the various ineffective assistance

26 of trial counsel claims.  *Id.* at 55-56.

27    Claims of ineffective assistance of appellate counsel are reviewed according to *Strickland*'s

28 two-pronged test. *Miller v. Keeney*, 882 F.2d 1428, 1433 (9th Cir. 1989); *United States v. Birtle*,

1   792 F.2d 846, 847 (9th Cir. 1986).  To prevail, a petitioner must show two things.  First, he must

2   establish that appellate counsel's deficient performance fell below an objective standard of

3   reasonableness under prevailing professional norms.  *Strickland*, 466 U.S. at 687-88.  Second, a

4   petitioner must establish that he suffered prejudice in that there was a reasonable probability that,

5   but for counsel's unprofessional errors, he would have prevailed on appeal.  *Id.* at 694.

6        The presumption of reasonableness is even stronger for appellate counsel because he has

7   wider discretion than trial counsel in weeding out weaker issues; doing so is widely recognized as

8   one of the hallmarks of effective appellate assistance.  *Miller v. Keeney*, 882 F.2d 1428, 1434 (9th

9   Cir. 1989).  Appealing every arguable issue would do disservice to a petitioner because it would

10  draw an appellate judge's attention away from stronger issues and reduce appellate counsel's

11  credibility before the appellate court.  *Id.*  Appellate counsel has no constitutional duty to raise every

12  nonfrivolous issue requested by a petitioner.  *Id.* at 1434 n.10 (citing Jones v. Barnes, 463 U.S. 745,

13  751-54, 103 S.Ct. 3308, 77 L. Ed. 2d 987 (1983)).

14                     **a.      Ground 8**

15       In Ground 8, Petitioner contends his appellate counsel was ineffective for abandoning two

16  Fourth Amendment issues on direct appeal.  (ECF No. 1-1 at 52-54.)  Specifically, Petitioner

17  contends appellate counsel abandoned his overbreadth and facial defectiveness claims.  *Id.*

18       Respondent contends the Court of Appeal correctly and reasonably resolved this issue

19  because Petitioner's appellate counsel did in fact raise the Fourth Amendment issues on appeal and

20  Petitioner did not prevail on them.  (ECF No. 8-1 at 23.)

21       In the last reasoned state court decision, the Court of Appeal denied Petitioner's claim of

22  ineffective assistance of appellate counsel.  (Lodgment 37 at 1-2.)  Specifically, the Court of Appeal

23  held: "[W]e note that we did address the contention that the trial court erred in denying a motion to

24  quash the search warrant for petitioner's home and to suppress the images of nude female children

25  found on his computer.  (See *People v. Weaver* (Apr. 12, 2007, D047225) [nonpub. opn.].)  To the

26  extent petitioner contends appellate counsel should have sought rehearing on other Fourth

27  Amendment issues, petitioner has not demonstrated there is a reasonable probability we would have

28  granted rehearing or that petitioner would have prevailed on his appeal.  (*Smith v. Robbins* (2000)

- 10 -

1    528 U.S. 259, 285-286.)" *Id.*

2          Here, Petitioner fails to demonstrate the Court of Appeal's decision that Petitioner received

3    effective assistance of appellate counsel was either an unreasonable application of *Strickland*, or was

4    based on an unreasonable determination of the facts.  Petitioner asserts he was denied effective

5    assistance of appellate counsel because his appellate counsel should have sought a rehearing on his

6    overbreadth and facial defectiveness Fourth Amendment claims.  (ECF No. 1-1 at 53.)  In denying

7    Petitioner's ineffective assistance of counsel claim, the Court of Appeal stated they did address

8    Petitioner's contentions that the trial court erred in denying a motion to quash the search warrant for

9    Petitioner's home, thereby implying appellate counsel raised these issues in his appellate brief.

10   (Lodgment 37 at 1.)  In fact, appellate counsel raised these Fourth Amendment Claims in appellant's

11   opening brief.  (Lodgment 27 at 49-63.)  Thus, Petitioner is unable to satisfy the first prong of the

12   *Strickland* standard, that his counsel's performance fell below an objective standard of

13   reasonableness.  *Strickland*, 466 U.S. at 688.

14         Further, Petitioner is unable to demonstrate he suffered prejudice as a result of ineffective

15   assistance of appellate counsel. Although appellate counsel failed to request a rehearing before the

16   Court of Appeal, appellate counsel raised Petitioner's Fourth Amendment claims in a petition for

17   review, which the California Supreme Court summarily denied.  (Lodgment 31 at 14-26; Lodgment

18   32.)  Therefore, the Court of Appeal properly concluded Petitioner is unable to establish  "there is a

19   reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding

20   would have been different." *Strickland*, 466 U.S. at 694.  Accordingly, the Court RECOMMENDS

21   Ground 8 of the Petition relating to Petitioner's claim of ineffective assistance of appellate counsel

22   be **DENIED**.

23                              **b.      Ground 9**

24         In Ground 9, Petitioner contends his appellate counsel was ineffective for failing to raise his

25   ineffective assistance of trial counsel claims on direct appeal.  (ECF No. 1-1 at 55-56.)  Specifically,

26   Petitioner contends appellate counsel erred in raising "two claims that were wholly frivolous while

27   omitting other stronger claims," such as his ineffective assistance of trial counsel claims.  *Id.* at 56.

28   Petitioner contends his ineffective assistance of trial counsel claims are stronger than the following

claims appellate counsel raised: (1) the improper joinder claim; and (2) the unconstitutionality of section 1108 claim. *Id.*

Respondent first contends Petitioner has failed to exhaust this claim in state court. (ECF No. 8-1 at 23.) However, even if this claim is exhausted, Respondent contends Petitioner cannot show his appellate counsel performed deficiently because he had no duty to raise any ineffective assistance of trial counsel claims in the direct appeal. *Id.* at 24. Moreover, since Petitioner raised these ineffective assistance of trial counsel claims in his habeas petition, which the California Supreme Court denied, Petitioner cannot show he suffered any prejudice. *Id.*

### I. Exhaustion

Before Petitioner can avail himself of this Court's jurisdiction to rule on the merits of his Petition, he must have first exhausted available state judicial remedies. 28 U.S.C. § 2254(b)(1)(A); *Picard v. Connor*, 404 U.S. 270, 275 (1971). The critical question in determining whether a federal claim has been exhausted is whether it has been fairly presented to the state courts. *Picard*, 404 U.S. at 275; *Anderson v. Harless*, 459 U.S. 4,6 (1982).

To fairly present a federal claim in state court, "it is not sufficient merely that the federal habeas applicant has been through state courts." *Picard*, 404 U.S. at 275-76. Instead, the petitioner must clearly state a ground for relief arising under the federal constitution so that the state court is apprised of the federal nature of the claim. *Duncan v. Henry*, 513 U.S. 364,365-66 (1995). A petitioner must provide the highest state court with a fair opportunity to consider the factual and legal bases of his claims before presenting them to the federal court. *Weaver v. Thompson*, 197 F.3d 359, 364 (9th Cir. 1999) (citing *Picard*, 404 U.S. at 276; *Johnson v. Zenon*, 88 F.3d 828, 829 (9th Cir. 1996)); see also *Duncan*, 513 U.S. at 365; *Correll v. Stewart*, 137 F.3d 1404, 1411-12 (9th Cir. 1997).

Nevertheless, the exhaustion requirement may be satisfied notwithstanding a failure to present a claim to the state supreme court, "if it is clear that [the habeas petitioner's] claims are now procedurally barred under [state] law." *Gray v. Netherland*, 518 U.S. 152, 161 (1996), quoting *Castille v. Peoples*, 489 U.S. 346, 351 (1989); *Engle v. Isaac*, 456 U.S. 107, 125-26 n.28 (1982) (noting that the exhaustion requirement applies "only to remedies still available at the time of the

1   federal petition."); *Valerio v. Crawford*, 306 F.3d 742, 770 (9th Cir. 2002) (same), citing *Phillips v.*

2   *Woodford*, 267 F.3d 966, 974 (9th Cir. 2001) ("the district court correctly concluded that [the]

3   claims were nonetheless exhausted because 'a return to state court for exhaustion would be futile.'").

4   "A habeas petitioner who has defaulted his federal claims in state court meets the *technical*

5   requirements for exhaustion; there are no state remedies any longer 'available' to him." *Cassett v.*

6   *Stewart*, 406 F.3d 614, 621 n.5 (9th Cir. 2005) (quoting *Coleman v. Thompson*, 501 U.S. 722, 732

7   (1991)).

8        Here, Petitioner's brief to the Superior Court of the County of San Diego, California Court of

9   Appeal and California Supreme Court contain no mention or analysis of an ineffective assistance of

10   appellate counsel as stated in Ground 9. (Lodgments 34, 36, 38.) Therefore, Petitioner has failed to

11   fairly present a federal claim to the highest state court. *Duncan*, 513 U.S. at 364. However,

12   Petitioner satisfies the technical requirement for exhaustion with respect to Ground 9 because he no

13   longer has state court remedies available to him. *Cassett*, 406 F.3d at 621. Because Petitioner's

14   direct appeal ended on July 11, 2007 (Lodgment 32), he cannot return to state court to fairly present

15   Ground 9 as it is now time-barred and therefore procedurally barred. Accordingly, Ground 9 of the

16   Petition is technically exhausted.

17        *ii.*    *Merits of Petitioner's Argument*

18        Petitioner failed to raise Ground 9 in the Superior Court of the County of San Diego,

19   California Court of Appeal and California Supreme Court. (Lodgments 34, 36, 38.) Therefore, no

20   state court made a merits determination on this claim. Thus, with respect to the ineffective

21   assistance of appellate counsel claim raised in Ground 9 of Petitioner's federal habeas petition, there

22   is no reasoned state court decision to which this Court can "look." *See Ylst*, 501 U.S. at 803.

23   Consequently, this Court must independently review the record to determine whether appellate

24   counsel's failure to raise the claims in Grounds 1-7 amounted to ineffective assistance of counsel

25   under *Strickland*.

26        After an independent review of the record, this Court finds Petitioner has not demonstrated

27   appellate counsel's failure to raise the claims in Grounds 1-7 on direct appeal or in a collateral

28   proceeding amounted to ineffective assistance of counsel under *Strickland*. The Supreme Court has

held that appellate counsel does not have a constitutional duty to raise every nonfrivolous issue requested by the defendant.  *See Jones v. Barnes*, 463 U.S. 745, 751-54 (1983); *Miller*, 882 F.2d at 1434 n. 10.  Rather, the "weeding out of weaker issues is widely recognized as one of the hallmarks of effective appellate advocacy."  *Miller*, 882 F.2d at 1434.  The objective reasonableness of counsel's failure to pursue claims on appeal depends upon the merits of the claims.  As set forth below in more detail,[3] the claims presented in Grounds 1-7 have been rejected by this Court and by the California Supreme Court.  (*See* Lodgment 39.)  Therefore, it was not objectively unreasonable for appellate counsel to not pursue them.  *See Miller*, 882 F.2d at 1434 n. 9 (citing *Strickland*, 466 U.S. at 688, 694).  Further, Petitioner was not prejudiced because Petitioner himself raised Grounds 1-7 in his habeas petition, which were rejected on the merits by this Court, as discussed below.  Therefore, there is not a reasonable probability that but for counsel's failure to raise these claims, he would have prevailed on appeal.  *See Miller*, 882 F.2d at 1434 n. 9 (citing *Strickland*, 466 U.S. at 688, 694).  Consequently, the Court RECOMMENDS Ground 9 of the Petition relating to Petitioner's claim of ineffective assistance of appellate counsel be **DENIED**.

### 2.      Ineffective Assistance of Trial Counsel Claims

In Grounds 1-7, Petitioner faults trial counsel for conducting an inadequate pretrial investigation, permitting perjured testimony, failing to prevail on a motion for an acquittal, permitting a poor instruction regarding pictures of child pornography found on Petitioner's computer, bolstering the credibility of the prosecution's witness on cross-examination, failing to object to the prosecutor's improper cross-examination of Petitioner, and failing to object to an "on or about" jury instruction.  (ECF No. 1 at 10-39, ECF No. 1-1 at 1-51.)

Respondent contends these claims were procedurally defaulted under California law as untimely.  (ECF No. 8-1 at 13.)  Even if these claims are not procedurally defaulted, Respondent contends Petitioner's trial counsel performed competently.  (ECF No. 8-1 at 18-22.)

### a.      Procedural Default

When a state court rejects a federal claim based upon a violation of a state procedural rule

---

[3] The Court will address the merits of Petitioner's ineffective assistance of trial counsel in further detail below.

which is adequate to support the judgment and independent of federal law, a habeas petitioner has procedurally defaulted his claim. *Coleman v. Thompson*, 501 U.S. 722, 729-30 (1991). A state procedural rule is "independent" if it is not interwoven with federal law. *LaCrosse v. Kernan*, 244 F.3d 702, 704 (9th Cir. 2001). A state procedural rule is "adequate" if it is "clear, consistently applied, and well-established" at the time of the default. *Calderon v. United States District Court*, 96 F.3d 1126, 1129 (9th Cir. 1996).

Respondent has the initial burden of pleading as an affirmative defense that Petitioner's failure to satisfy a state procedural bar forecloses federal habeas review. *Bennett v. Mueller*, 322 F.3d 573, 586 (9th Cir. 2003). Once Respondent has asserted the existence of an adequate and independent state procedural ground as an affirmative defense, the burden shifts to Petitioner who must place this defense at issue by "asserting specific factual allegations that demonstrate the inadequacy of the state procedure, including citation to authority demonstrating inconsistent application of the rule." *Id.* at 586. If Petitioner meets his burden to place the defense at issue, the ultimate burden to demonstrate the adequacy of a state procedural bar is on Respondent. *Id.*

The Court, however, may still reach the merits of a procedurally defaulted claim if the petitioner can demonstrate cause for the procedural default and actual prejudice resulting from the default, or if the failure of the Court to review the claim would result in a fundamental miscarriage of justice. *Coleman*, 501 U.S. at 750.

Here, Respondent has pleaded that the California Court of Appeal, in the last reasoned state court decision, clearly and expressly stated the denial of Petitioner's ineffective assistance of trial counsel claims rested on a state procedural bar. (Lodgement 37 at 1.) The Court of Appeal stated: "Petitioner knew of trial counsel's effectiveness at the latest when he was convicted on June 1, 2005. His contentions regarding trial counsel are therefore untimely. (*In re Clark*, (1993) 5 Cal.4th 750, 783.)"[4]

Therefore, the burden has shifted to Petitioner to challenge the independence or adequacy of

---

[4] Petitioner raised the ineffective assistance of trial counsel claims for the first time in his habeas petition in San Diego Superior Court on December 30, 2008, nearly three and a half years after his June 1, 2005 conviction. (Lodgment 34.) In citing *In re Clark* to conclude Petitioner's ineffective assistance of trial counsel claims were untimely, the Court of Appeal found Petitioner did not adequately explain and justify the "substantial delay" in presenting his claims. 5 Cal.4th 750, 783 (1993).

1    the procedural bar.  *Bennett*, 332 F.3d at 586.  In his Traverse, Petitioner states he "does not dispute

2    the finding that 3 ½ years [the time between Petitioner's conviction and the filing of his habeas

3    petition] constitutes a period of substantial delay."  (ECF No. 12-1 at 3.)  Instead, Petitioner cites

4    various cases between 1999 and 2009, which have found California's substantial delay rule to be

5    inadequate to bar federal habeas review.  *Id.* at 5.  However, in *Walker v. Martin*, 562 U.S. –, No.

6    09-996 (Feb. 23, 2011), the Supreme Court held California's untimeliness rule is, and has been, an

7    independent and adequate state ground sufficient to support a procedural default in a federal habeas

8    action.  Therefore, Petitioner cannot meet his burden under *Bennett*.  As a result, his claims in

9    Grounds 1-7 regarding ineffective assistance of trial counsel are procedurally defaulted.

10        Moreover, Petitioner fails to demonstrate (1) cause for the procedural default and actual

11   prejudice from the claimed violation, or (2) that the failure to review the claim would result in a

12   fundamental miscarriage of justice.  *See Coleman*, 501 U.S. at 750.

13        Petitioner contends the ineffective assistance of appellate counsel is the cause for the

14   procedural default.  (ECF No. 12-1 at 5-8.)  In order to show counsel's ineffectiveness was the

15   cause, Petitioner must show counsel's performance was professionally unreasonable and a

16   reasonable probability that the outcome would be different if the claims in question had been

17   brought.  *Williamson v. Jones*, 936 F.2d 1000, 1006 (8th Cir. 1991).  Petitioner contends appellate

18   counsel failed to do the following: (1) raise Grounds 2-7 of the instant petition in direct appeal; (2)

19   raise Petitioner's ineffective assistance of counsel claims in a habeas petition; and (3) raise some of

20   Petitioner's ineffective assistance of counsel claims as independent grounds for relief.  (ECF No. 12-

21   1 at 6-7.)  However, as discussed above, Petitioner neither shows how appellate counsel's

22   performance was professionally unreasonable nor a reasonable probability that the outcome would

23   be different if his claims in Grounds 1-7 had been brought by appellate counsel.

24        Petitioner has also failed to demonstrate that a miscarriage of justice would result absent

25   review of the claim by this Court.  *See Coleman*, 501 U.S. at 748; *Vansickel*, 166 F.3d at 957-58.

26        Therefore, the Court is precluded from considering the merits of Petitioner's ineffective

27   assistance of trial counsel claims. However, even if these claims are not procedurally barred, they

28   lack merit.

1   //

2                                **b.**       **The Merits**

3          The United States Supreme Court set forth the test for demonstrating ineffective assistance of

4   counsel in *Strickland v. Washington*, 466 U.S. 668 (1984).  First, a petitioner must show that,

5   considering all the circumstances, counsel's performance fell below an objective standard of

6   reasonableness.  *Strickland*, 466 U.S. at 688.  To this end, petitioner must identify the acts or

7   omissions that are alleged not to have been the result of reasonable professional judgment.  *Id.* at

8   690.  The federal court must then determine whether in light of all the circumstances, the identified

9   acts or omissions were outside the wide range of professional competent assistance.  *Id.*  "We

10   strongly presume that counsel's conduct was within the wide range of reasonable assistance, and that

11   he exercised acceptable professional judgment in all significant decisions made."  *Hughes v. Borg*,

12   898 F.2d 695, 702 (9th Cir. 1990) (citing *Strickland*, 466 U.S. at 689).  There is no Sixth

13   Amendment right, however, to an attorney who shares a defendant's view of what strategy counsel

14   should pursue.  *See United States v. Mejia-Mesa*, 153 F.3d 925, 931 (9th Cir. 1998).

15          Second, a petitioner must affirmatively prove prejudice.  *Strickland*, 466 U.S. at 693.

16   Prejudice is found where "there is a reasonable probability that, but for counsel's unprofessional

17   errors, the result of the proceeding would have been different."  *Id.* at 694.  A reasonable probability

18   is "a probability sufficient to undermine confidence in the outcome."  *Id.*; *see also Williams v.

19   Taylor*, 529 U.S. at 391-92; *Laboa v. Calderon*, 224 F.3d 972, 981 (9th Cir. 2000).  A reviewing

20   court "need not determine whether counsel's performance was deficient before examining the

21   prejudice suffered by the defendant as a result of the alleged deficiencies . . . If it is easier to dispose

22   of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be

23   followed."  *Pizzuto v. Arave*, 280 F.3d 949, 955 (9th Cir. 2002) (quoting *Strickland*, 466 U.S. at

24   697).

25          Petitioner raised the issues of ineffective assistance of counsel in his habeas petition in San

26   Diego Superior Court, the California Court of Appeal, and the California Supreme Court.

27   (Lodgments 34, 36, 38.)  Both San Diego Superior Court and the California Court of Appeal deemed

28   Petitioner's ineffective assistance of trial counsel claims procedurally defaulted, and therefore

1   neither court made a merits determination on these claims.  (Lodgments 35, 37.)  The California

2   Supreme Court, however, denied Petitioner's habeas petition without citation of authority or

3   analysis.  (Lodgment 39.)  Thus, with respect to the ineffective assistance of trial counsel claims in

4   Petitioner's federal habeas petition (Grounds 1-7), there is no reasoned state court decision to which

5   this Court can "look" from the California Supreme Court's postcard denial.  *See Ylst*, 501 U.S. at

6   803.  Therefore, this Court must independently review the record to determine whether the

7   California Supreme Court's rejection of these claims was objectively reasonable.  *Delgado*, 223 F.3d

8   at 981-82.

9         After an independent review of the record, this Court finds Petitioner has failed to allege

10   facts indicating his trial counsel was ineffective.  *Delgado,* 223 F.3d at 981-982.  First, Petitioner's

11   contentions in Grounds 1-7 generally reflect objections to the rules of evidence and trial procedure,

12   both issues trial attorneys do not control.  Also, Petitioner objects to the tactical decisions trial

13   counsel made before and during trial.  There is no Sixth Amendment right, however, to an attorney

14   who shares a defendant's view of what strategy counsel should pursue.  *See United States v.*

15   *Mejia-Mesa*, 153 F.3d 925, 931 (9th Cir. 1998).  Thus, Petitioner is unable to satisfy the first prong

16   of the *Strickland* standard, that his counsel's performance fell below an objective standard of

17   reasonableness.  *Strickland*, 466 U.S. at 688.

18         Further, a careful review of the record indicates Petitioner is unable to demonstrate he

19   suffered prejudice as a result of ineffective assistance of trial counsel.  *Strickland*, 466 U.S. at 693.

20   The overwhelming evidence against Petitioner, along with trial counsel's competent performance,

21   negates the "probability that, but for counsel's unprofessional errors, the result of the proceeding

22   would have been different."  *Id.* at 694.

23         Therefore, the California Supreme Court's rejection of Petitioner's claims in Grounds 1-7 is

24   objectively reasonable.  *Delgado*, 223 F.3d at 981-82.  Accordingly, the Court hereby

25   RECOMMENDS Grounds 1-7 of the Petition be **DENIED**.

26                     **3.      Jury Instruction Error**

27         In Ground 10 of his Petition, Petitioner contends the trial court violated his right to be

28   convicted only upon proof beyond a reasonable doubt, as guaranteed by the Fourteenth Amendment.

1    (ECF No. 1-1 at 57-61.)  Specifically, Petitioner contends CALJIC No. 2.50.01 permitted the jury to

2    convict him of the charged offenses based on proof by a preponderance of the evidence that

3    Petitioner committed the uncharged act of possessing child pornography.  *Id.*

4          Respondent contends the California Court of Appeal reasonably and properly denied

5    Petitioner's instruction claim on direct appeal.  (ECF No. 8-1 at 17-18.)

6          Often, a challenge to a jury instruction will not state a federal constitutional claim.  *See*

7    *Estelle v. McGuire*, 502 U.S. at 71-72.  However, a petitioner can obtain federal habeas relief on a

8    jury instruction claim if he can demonstrate that the instructional error " by itself so infected the

9    entire trial that the resulting conviction violates due process."  *Id.* at 72 (citing *Cupp v. Naughten*,

10   414 U.S. 141, 147 (1973).  If a federal habeas court determines that the trial court erred in

11   instructing the jury, it must also determine whether the error prejudiced the defendant.  *See*

12   *Henderson v. Kibbe*, 431 U.S. 145, 153-54 (1977).  A challenged instruction must not be viewed in

13   isolation; instead, it must be considered "in the context of the instructions as a whole and the trial

14   record."  *Estelle*, 502 U.S. at 72 (citing *Cupp*, 414 U.S. at 147).

15         Petitioner raised his claim regarding jury instruction error in the petition for review he filed

16   in the California Supreme Court, which the Court summarily denied.  (Lodgments 31, 32.)

17   Accordingly, this Court must "look through" to the state appellate court's opinion denying this claim

18   as the basis for its analysis.  *Ylst*, 501 U.S. at 803.  The appellate court rejected Petitioner's claim the

19   trial court violated his due process right to be convicted only on proof beyond a reasonable doubt by

20   permitting the jury under Evidence Code section 1108 and the related jury instruction (CALJIC No.

21   2.50.01) to convict by a preponderance of the evidence.  (Lodgment 30 at 40-41.)  First, the

22   appellate court quoted the 2002 revised version of CALJIC No. 2.50.01, as modified in this case:

23         "Evidence has been introduced for the purpose of showing that the defendant engaged in a
       sexual offense on one or more occasions other than that charged in the case. [¶] 'Sexual offense'
24     means a crime under the laws of a state or of the United States that involves any of the following:
       [¶] [A.] Any conduct made criminal by...section 311.11.[5] The elements of these crimes are set forth
25

26   _____

27         [5] Section 311.11, which makes the knowing possession of child pornography a criminal offense,
     provided in part: "(a) Every person who knowingly possesses...any...image..., knowing that the matter
28   depicts a person under the age of 18 personally engaging in or simulating sexual conduct, as
     defined in subdivision (d) of Section 311.4, is guilty of a public offense and shall be punished by
     imprisonment in the county jail for up to one year, or by imprisonment in the state prison, or by a fine

1   elsewhere in these instructions.  [¶] If you find, by a preponderance of the evidence, that the
defendant committed a prior sexual offense, you may, but are not required to, infer that the
2   defendant had a disposition to commit other sexual offenses.  If you find that the defendant had this
disposition, you may, but are not required to, infer that he was likely to commit and did commit the
3   crimes of which he is accused in Counts One through Seven.  The weight and significance, if any, of
such evidence is for you to decide.  [¶] However, *if you find by a preponderance of the evidence that*
4   *the defendant committed other sexual offenses, that is not sufficient to prove beyond a reasonable*
*doubt that he committed the charged crimes.  If you determine an inference properly drawn from*
5   *this evidence, in determining whether the defendant has been proven guilty beyond a reasonable*
*doubt of the charged crime.*  Unless you are otherwise instructed, you must not consider this
6   evidence for any other purpose."  (Italics added.)  (Lodgment 30 at 41-42.)

7        Further, the appellate court analyzed the California Supreme Court's holding in *People v.*

8   *Reliford* 29 Cal.4th 1007 (2003), where a defendant challenged his conviction of various sexual

9   offenses, claiming the 1999 version of CALJIC No. 2.50.01 given to the jury was misleading with

10  respect to the prosecution's burden of proof.  (Lodgment 30 at 42-43.)  In *Reliford*, the California

11  Supreme Court rejected defendant's claim and noted that the instruction admonished the jury that "if

12  you find by a preponderance of the evidence that the defendant committed a prior sexual

13  offense...that is not sufficient by itself to prove beyond a reasonable doubt that he committed the

14  charged crimes."  *Id.* at 42.  Therefore, the Court held the 1999 version of CALJIC No. 2.50.01 did

15  not authorize a guilty verdict based solely on proof of uncharged conduct and thereby did not allow

16  the jury to convict the defendant based solely upon prior bad acts proven by a preponderance of

17  evidence.  *Id.* at 42-43.

18       Based on the reasoning set forth in *Reliford*, the appellate court held:

19       Although the *Reliford* court found no constitutional error in the 1999 version of CALJIC No.
2.50.01, it recognized that the instruction "could be improved," and noted with approval that the
20  2002 version to CALJIC No. 2.50.01 inserted the following cautionary statement: "'If you determine
an inference properly can be drawn from this evidence, this inference is simply one item for you to
21  consider, along with all other evidence, in determining whether the defendant has been proved guilty
beyond a reasonable doubt of the charged crime.'" (*Reliford, supra*, 29 Cal.4th at p. 1016.)
22
     Here, the challenged instruction–the 2002 version of CALJIC No. 2.50.01, as modified in
23  this case–is essentially the same instruction that the Supreme Court approved in *Reliford*.  Weaver's
claim of constitutional error is unavailing.
24  (Lodgement 30 at 43.)

25       Here, Petitioner fails to demonstrate the Court of Appeal's decision the jury instruction was

26  proper is contrary to or an unreasonable application of clearly established federal law or an

27  unreasonable determination of facts.  In rejecting Petitioner's claim, the Court of Appeal noted the

28  _____

not exceeding two thousand five hundred dollars ($2,500), or by both the fine and imprisonment."

1    2002 version of the instruction had improved upon, and removed a potential defect from, an earlier

2    version of the instruction because the 2002 version specifically included language emphasizing the

3    prosecutor's burden of proof beyond a reasonable doubt. (Lodgment 30 at 40-43.)  Contrary to

4    Petitioner's contention, CALJIC No. 2.50.1–which permitted the jury to find defendant committed

5    other crimes or sexual offenses by a preponderance of the evidence– expressly informed the jury that

6    "before a defendant can be found guilty of any crime charged in this trial, the evidence as a whole

7    must persuade you beyond a reasonable doubt that the defendant is guilty."  (Lodgment 24 at 284.)

8    The judge also correctly instructed the jury on proof beyond a reasonable doubt and the presumption

9    of innocence.  *Id.* at 271.  Further, the trial court instructed the jury on the limited purposes for

10   which the jury could consider evidence of possession of child pornography.  *Id.* at 283. Thus, based

11   on the contested instruction itself, as well as the totality of the instructions given to the jury,

12   Petitioner cannot demonstrate CALJIC No. 2.50.1 so infected the entire trial that Petitioner's

13   resulting conviction violated due process.  *Estelle*, 502 U.S. 62, 67 (1991) (quoting *Cupp*, 414 U.S.

14   at 141.) Therefore, the decision of the Court of Appeal rejecting Petitioner's claim the trial court

15   violated his due process right does not involve an unreasonable application of federal law.

16   Accordingly,  the Court RECOMMENDS Ground 10 of the Petition be **DENIED**.

17   //

18   //

19   //

20   //

21   //

22   //

23   //

24   //

25   //

26   //

27   //

28   //

1

### V. CONCLUSION

2          After thorough review of the record in this case and based on the foregoing, the Court hereby

3   RECOMMENDS the Petition be **DENIED.**

4          This Report and Recommendation of the undersigned Magistrate Judge is submitted to the

5   United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(1)

6   (1994).  Any party may file written objections with the Court and serve a copy on all parties on or

7   before **June 10, 2011.**  The document should be captioned "Objections to Report and

8   Recommendation."  Any reply to the objections shall be served and filed on or before **June 24,**

9   **2011.**  The parties are further advised that failure to file objections within the specified time may

10  waive the right to appeal the district court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

11         **IT IS SO ORDERED.**

12  DATED:  May 12, 2011

13

14                                                      LOUISA S PORTER
                                                        United States Magistrate Judge
15

16

17

18

19

20

21

22

23

24

25

26

27

28